IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| STUART D. HOWARD, | ) | 4:12CV3194 |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| ROBERT P. HOUSTON, | ) | |
| | ) | |
| Respondent. | ) | |

This matter is before the court on Petitioner Stuart Howard's ("Petitioner" or "Howard") Petition for Writ of Habeas Corpus. (Filing No. 1.) Howard argues that he is entitled to a writ of habeas corpus based on the following claims:

Claim One:  Petitioner was subjected to an unreasonable seizure in violation of the Fourth Amendment because (1) "reasonable suspicion was not present to warrant further detention after citation was issued;" and (2) Petitioner's hour-long "wait for the canine . . . created an arrest, thereby requiring probable cause."

Claim Two:  Petitioner was denied due process of law and the effective assistance of counsel in violation of the Sixth and Fourteenth Amendments because (1) trial counsel waived Petitioner's right to a jury trial and did not explain to Petitioner that by doing so, he would give up certain rights; (2) trial counsel and appellate counsel did not file a motion for newly discovered evidence once it was known Petitioner's co-defendant had a proffer interview prior to trial; and (3) trial counsel and appellate counsel did not raise prosecutorial misconduct (a Brady violation) in a

timely manner, did not test the evidence, and did not cross-examine witnesses.

(*Id.*)  For the reasons set forth below, a grant of a writ of habeas corpus is not warranted on any of these issues.

# I. BACKGROUND

## A.    Conviction

The State of Nebraska ("State") charged Howard by information in the District Court of Lancaster County, Nebraska ("state district court") with possession of a controlled substance with intent to deliver.  (Filing No. 10-12 at CM/ECF p. 17.)  The evidence presented in the state district court showed that:

> On June 1, 2009, at 12:50 p.m., [Anthony] Laws was driving a sports utility vehicle (SUV) towing a popup camper eastbound on Interstate 80 in Lancaster County, Nebraska. Nebraska State Patrol officer Robert Pelster's stationary radar showed the SUV was traveling 63 m.p.h. in a 55-m.p.h. construction zone. Pelster initiated a traffic stop.

> During the stop, Pelster noted that Laws was driving the vehicle and that there was a female passenger, Sarah R. McGee, in the front seat and a male passenger, Howard, in the rear seat. Pelster thought Laws seemed very nervous and noticed that his hands were shaking. Laws provided documentation showing that both the SUV and the popup camper had been rented near Detroit, Michigan. The SUV was rented on the evening of May 28, 2009, for $767, and the camper was rented on May 29 for $500. The rental documents showed that the camper had been rented by Howard and that the SUV had been rented by Ebony Young. Howard informed Pelster that Young was his sister. Both Young and Howard were listed as authorized drivers of the SUV. Laws, who was not listed as an authorized driver, initially told Pelster that he had driven during the entire trip.

2

Laws accompanied Pelster to his cruiser while Howard and McGee remained in the SUV. When Pelster asked Laws about his shaking hands, Laws explained that his hands were shaking because he had not consumed any alcohol for some time. Pelster asked about the group's travel, and Laws told him that they had driven from Detroit to Flagstaff, Arizona, and had seen some sights, including the Grand Canyon. Laws stated that Howard and McGee were his friends, and he was unsure as to exactly when they left Detroit because he was intoxicated at the time. Laws told Pelster that the three did not know anyone in Arizona, but instead had gone there just to sightsee.

Pelster checked the criminal histories of the three travelers and learned that Howard's driver's license was suspended, that an active protection order was issued against him, and that he had a prior criminal history for weapons and assault. Pelster also learned that Laws had a record of a weapons offense and had been involved in a homicide or an attempted homicide. Pelster obtained no criminal history for McGee, but determined that she did not have a driver's license. Pelster then left Laws in the cruiser and returned to the SUV, where Howard and McGee were waiting, to question McGee in order to verify that she was not the subject of the protection order that was issued against Howard. McGee informed him that she was not, and she confirmed that the three had visited Flagstaff and the Grand Canyon. During this conversation, Howard told Pelster that he had family in Flagstaff. Howard also referred to Laws as his uncle.

After speaking with Howard and McGee, Pelster returned to his cruiser to speak to Laws. This occurred at approximately 1:14 p.m. Laws, who had overheard Pelster's conversation with Howard and McGee on the police radio, immediately told Pelster that he and Howard were just friends but that because Laws was older, Howard referred to him as his uncle. Pelster issued a warning citation to Laws at 1:26 p.m., and then asked Laws for permission to search his luggage. Laws agreed. Because the rental documents were in Howard's name, Pelster then asked Howard for permission to search the SUV and the camper. When Howard refused, Pelster radioed for a trained drug detection canine unit to come to the scene.

3

> Pelster had some difficulty locating a canine unit, and finally, at 1:50 p.m., he was advised that Investigator Alan Eberle and his canine, Rocky, were en route from Omaha, Nebraska. Eberle and Rocky arrived at approximately 2:30 p.m. Rocky alerted on the camper, and a subsequent search led to the discovery of 727.5 pounds of marijuana inside the camper. Laws, Howard, and McGee were all arrested.

*State v. Howard*, 803 N.W.2d 450, 457-458 (Neb. 2011).

Howard filed a motion to suppress all physical evidence seized after the search. He argued that Nebraska State Patrol Officer Robert Pelster ("Pelster") lacked reasonable suspicion to detain him after the conclusion of the traffic stop. *Id.* at 459. The state district court held an evidentiary hearing on the motion to suppress, and later denied the motion. *Id.* Thereafter, Howard waived his right to a jury trial and proceeded with a bench trial on stipulated evidence. *Id.* Based on the evidence submitted, the state district court found Howard guilty. *Id.* The state district court sentenced Howard to a prison term of not less than 10 years nor more than 14 years. (Filing No. 10-12 at CM/ECF p. 51.)

## B.   Direct Appeal

On June 30, 2010, Howard filed a notice of appeal from the criminal prosecution. (Filing No. 10-12 at CM/ECF p. 1.) Howard raised numerous arguments on appeal, including Claim One and part of Claim Two now raised in his Petition. On February 4, 2011, the Nebraska Supreme Court ordered the appeal moved to its docket from the docket of the Nebraska Court of Appeals. (Filing No. 10-1 at CM/ECF p. 1.) On September 23, 2011, the Nebraska Supreme Court affirmed Howard's conviction and sentence. *See Howard*, 803 N.W.2d at 469.

4

## C.     Post-Conviction Motion and Appeal

Howard filed a motion for post-conviction relief on November 14, 2011, in the state district court.  (Beginning at Filing No. 10-13 at CM/ECF p. 27.)  He did not raise any of the claims he now raises in his Petition in his motion for post-conviction relief.  The state district court denied Howard's post-conviction motion on April 3, 2012.  (Beginning at *id.* at CM/ECF p. 74.)

Howard appealed the denial of his motion for post-conviction relief to the Nebraska Court of Appeals, which dismissed the appeal for lack of jurisdiction on July 11, 2012.  (Filing No. 10-4 at CM/ECF p. 1.)  Howard filed a motion for rehearing with the Nebraska Court of Appeals, which was denied because Howard failed to file a brief in support of the motion.  (Filing No. 10-5 at CM/ECF p. 1.) Petitioner did not file a petition for further review with the Nebraska Supreme Court. (*See* copy of state court docket sheet at Filing No. 10-7 at CM/ECF p. 2.)

## D.     Habeas Corpus Petition

Howard timely filed his Petition in this court on September 11, 2012.  (Filing No. 1.)  In response to Howard's Petition, Respondent filed an answer, a brief in support of the answer, and the relevant state court records.  (Filing Nos. 10, 15, and 16.)  Thereafter, Howard filed a brief in support of his Petition.  (Filing No. 21.)  The court deems this matter fully submitted.

## II.  STANDARD OF REVIEW

## A.     Standard Under 28 U.S.C. § 2254(d)

When a state court has adjudicated a habeas petitioner's claim on the merits, there is a very limited and extremely deferential standard of review both as to the law and the facts.  *See* 28 U.S.C. § 2254(d).  Section 2254(d)(1) states that a federal court

5

may grant a writ of habeas corpus if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).  As explained by the Supreme Court in *Williams v. Taylor*, 529 U.S. 362 (2000), a state court acts contrary to clearly established federal law if it applies a legal rule that contradicts the Supreme Court's prior holdings or if it reaches a different result from one of that Court's cases despite confronting indistinguishable facts. 529 U.S. at 405-406.  Further, "it is not enough for [the court] to conclude that, in [its] independent judgment, [it] would have applied federal law differently from the state court; the state court's application must have been objectively unreasonable." *Rousan v. Roper*, 436 F.3d 951, 956 (8th Cir. 2006).

With regard to the deference owed to factual findings of a state court's decision, Section 2254(d)(2) states that a federal court may grant a writ of habeas corpus if a state court proceeding "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).  Additionally, a federal court must presume that a factual determination made by the state court is correct, unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

As the Supreme Court noted, "[i]f this standard is difficult to meet, that is because it was meant to be." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011).  The deference due state court decisions "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Id.*  In short, "[i]t bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.*  However, this high degree of deference only applies where a claim has been adjudicated on the merits by the state court. *See Brown v. Luebbers*, 371 F.3d 458, 460 (8th Cir. 2004) ("[A]s the language of the statute makes clear, there is a condition precedent that must be satisfied before we can

6

apply the deferential AEDPA standard to [the petitioner's] claim.  The claim must have been 'adjudicated on the merits' in state court.").

The Eighth Circuit clarified what it means for a claim to be adjudicated on the merits, finding that:

> AEDPA's requirement that a petitioner's claim be adjudicated on the merits by a state court is not an entitlement to a well-articulated or even a correct decision by a state court. . . . Accordingly, the postconviction trial court's discussion of counsel's performance–combined with its express determination that the ineffective-assistance claim as a whole lacked merit–plainly suffices as an adjudication on the merits under AEDPA.

*Worthington v. Roper*, 631 F.3d 487, 496-97 (8th Cir. 2011) (internal quotation marks and citations omitted).  The court also determined that a federal court reviewing a habeas claim under AEDPA must "look through" the state court opinions and "apply AEDPA review to the 'last reasoned decision' of the state courts."  *Id.* at 497.  A district court should do "so regardless of whether the affirmance was reasoned as to some issues or was a summary denial of all claims."  *Id.*  The Supreme Court agrees, stating:

> There is no text in the statute requiring a statement of reasons.  The statute refers only to a "decision," which resulted from an "adjudication."  As every Court of Appeals to consider the issue has recognized, determining whether a state court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning.

*Harrington*, 131 S. Ct. at 784.

7

**B.    Exhaustion Requirement**

As set forth in 28 U.S.C. § 2254(b)(1):

(b)(1)       An application for a writ of habeas corpus on behalf of a
person in custody pursuant to the judgment of a State court
shall not be granted unless it appears that–

(A)    the applicant has exhausted the remedies available in
the courts of the State; or

(B)    (i)    there is an absence of available State
corrective process; or
(ii)   circumstances exist that render such process
ineffective to protect the rights of the
applicant.

28 U.S.C. § 2254(b)(1).

The United States Supreme Court has explained the habeas exhaustion
requirement as follows:

Because the exhaustion doctrine is designed to give the state courts a full
and fair opportunity to resolve federal constitutional claims before those
claims are presented to the federal courts . . . state prisoners must give
the state courts one full opportunity to resolve any constitutional issues
by invoking one complete round of the State's established appellate
review process.

*O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).  A state prisoner must therefore
"fairly present" the substance of each federal constitutional claim to the state courts
*before* seeking federal habeas relief.  *Id.* at 844.  In Nebraska, "one complete round"
ordinarily means that each § 2254 claim must have been presented in an appeal to the
Nebraska Court of Appeals, and then in a petition for further review to the Nebraska

8

Supreme Court if the Court of Appeals rules against the petitioner.  *See Akins v. Kenney*, 410 F.3d 451, 454-55 (8th Cir. 2005).

Moreover, where "no state court remedy is available for the unexhausted claim—that is, if resort to the state courts would be futile—then the exhaustion requirement in § 2254(b) is satisfied, but the failure to exhaust 'provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default.'" *Armstrong v. Iowa*, 418 F.3d 924, 926 (8th Cir. 2005) (quoting *Gray v. Netherland*, 518 U.S. 152, 162 (1996)).  Stated another way, if a claim has not been presented to the Nebraska appellate courts and is now barred from presentation, the claim is procedurally defaulted, not unexhausted. *Akins*, 410 F.3d at 456 n. 1.

Under Nebraska law, "[a]n appellate court will not entertain a successive motion for postconviction relief unless the motion affirmatively shows on its face that the basis relied upon for relief was not available at the time the movant filed the prior motion." *State v. Ortiz*, 670 N.W.2d 788, 792 (Neb. 2003).  Additionally, "[a] motion for postconviction relief cannot be used to secure review of issues which were or could have been litigated on direct appeal." *Hall v. State*, 646 N.W.2d 572, 579 (Neb. 2002).  In such circumstances, where a Nebraska state court rejects a claim on state procedural grounds, and issues a "'plain statement' that it is rejecting petitioner's federal claim on state procedural grounds," a federal habeas court is precluded from "reaching the merits of the claim." *Shaddy v. Clarke*, 890 F.2d 1016, 1018 (8th Cir. 1989); *see also Greer v. Minnesota*, 493 F.3d 952, 957 (8th Cir. 2007) (reiterating that "when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement," federal habeas is barred because "[i]n such instances, the state prisoner forfeits his right to present his federal claim through a federal habeas corpus petition") (quotations omitted).  However, the state court procedural decision must "rest[] on independent and adequate state procedural grounds." *Barnett v. Roper*, 541 F.3d 804, 808 (8th Cir. 2008) (quotation

9

omitted).  "A state procedural rule is adequate only if it is a firmly established and regularly followed state practice." *Id.* (quotation omitted).

## III.  DISCUSSION

### A.  Reasonable Suspicion Justified Further Detention

Liberally construed, Howard claims that he was subjected to an unreasonable seizure in violation of the Fourth Amendment because Pelster lacked reasonable suspicion to detain him after he issued the traffic citation.  (Filing No. 1 at CM/ECF p. 6.)  Thomas raised a similar claim to the Nebraska Supreme Court on direct appeal. (*See* appellate brief at Filing No. 10-8 at CM/ECF p. 2.)  The Nebraska Supreme Court adjudicated and rejected the argument on the merits.  *See Howard*, 803 N.W.2d at 459-463.  In denying the claim, the Nebraska Supreme Court wrote, in relevant part:

> In order to expand the scope of a traffic stop and continue to detain the motorist for the time necessary to deploy a drug detection dog, an officer must have a reasonable, articulable suspicion that a person in the vehicle is involved in criminal activity beyond that which initially justified the interference. [*State v. Louthan*, 744 N.W.2d 454 (Neb. 2008).]  Reasonable suspicion entails some minimal level of objective justification for detention, something more than an inchoate and unparticularized hunch, but less than the level of suspicion required for probable cause. [*Id.*]  Whether a police officer has a reasonable suspicion based on sufficient articulable facts depends on the totality of the circumstances. [*Id.*] Reasonable suspicion must be determined on a case-by-case basis. [*Id.*]

> In this case, the district court found that Pelster had a reasonable, articulable suspicion that the occupants of the SUV were involved in criminal activity, based on (1) the illogical nature of the trip, which was expensive, driving-intensive, and very short; (2) Laws' nervousness; (3) Laws' explanation that his shaking hands were caused by alcohol deprivation when he was the only driver of the vehicle on the long trip;

10

(4) the use of a single driver on such a long trip; (5) the fact that the camper had not been used during the trip; and (6) the recent law enforcement contacts of Laws and Howard. We examine each of these factors separately, mindful of the rule that when a determination is made to detain a person during a traffic stop, even where each factor considered independently is consistent with innocent activities, those same factors may amount to reasonable suspicion when considered collectively. [*Id.*]

(a) Illogical Nature of Trip

The parties left Detroit no earlier than the morning of May 29, 2009. The traffic stop occurred on Interstate 80 near Lincoln, Nebraska, on June 1 at 12:50 p.m. Pelster testified at the hearing on the motions to suppress that he thought the distance between Detroit and Phoenix, Arizona, was 2,000 miles, and he estimated it would take about 28 hours to drive that distance. Pelster further testified that he thought the distance between Phoenix and Lincoln was 1,300 miles. Based on general calculations, Pelster estimated that the parties could not have been in Phoenix for much more than 12 hours.

Laws argues that the evidence shows that the parties were in Flagstaff, not Phoenix, and that the distance between Detroit and Flagstaff is 1,800 miles. He calculates that they were actually in Flagstaff for 22 to 25 hours. Laws contends that the 22-to 25-hour stay, as opposed to the 12-hour stay calculated by Pelster, "conclusively proves that Pelster was fashioning facts to justify his detention and search of the vehicle."

Pelster admittedly was estimating the group's travel times at the time of the traffic stop. Although his estimates may have been slightly off, that fact does not necessarily invalidate his conclusion that the nature of the trip was unusual and suspicious. Even under Laws' calculations, the parties drove 28 straight hours from Detroit to Flagstaff, stayed there for approximately 24 hours, and then drove another 14 straight hours before being stopped outside of Lincoln. Contrary to the assertions made in Laws' brief, a reasonable officer who learned that parties had driven from Detroit to Flagstaff on May 29, 2009, and were midway through a

11

return trip on June 1 would be suspicious of the motive behind the trip. Considering that the trip was made in an SUV which was pulling a popup camper and that both vehicles were rented specifically for the trip at a combined cost of approximately $1,300, the level of suspicion logically increases. Simply stated, there is no innocent explanation for renting a vehicle and a popup camper and then driving more than 25 hours straight to a destination, staying for less than one full day without utilizing the camper, and then driving straight back. The short duration of the long road trip, especially viewed in light of its expense and its utilization of the rental vehicles, is an important factor in the reasonable suspicion analysis.

Both Laws and Howard argue that the nature of the travel in this case is similar to travel in other cases which have not been found to be suspicious. Laws relies on *U.S. v. Beck*, [140 F.3d 1129 (8th Cir. 1998),] *U.S. v. Kirkpatrick*, [5 F.Supp.2d 1045 (D.Neb. 1998),] and *State v. McGinnis*[, 608 N.W.2d 605 (Neb. Ct. App. 2000)]. In *Beck*, the defendant, a truckdriver, was driving from California to North Carolina for a job interview. The court found nothing inherently suspicious about a job search in a different location of the country. In *Kirkpatrick*, the defendant was stopped in a vehicle he had rented in Las Vegas, Nevada, and stated he was returning home to Minnesota. He told the officer that he had flown to Las Vegas in order to drive his niece to Denver, Colorado, because his niece's mother did not want the niece to fly. The court found there was nothing suspicious about the trip or his explanation of it. In *McGinnis*, the defendant flew from Seattle, Washington, to San Francisco, California; rented a car; and began driving to New York. He told officers that he was going to visit his ailing grandfather and that because he had never driven across the country before, he wanted to try it one time. The court found that although the trip was unconventional, it was not suspicious.

Both Laws and Howard cite *State v. Passerini*[, 789 N.W.2d 60 (Neb. Ct. App. 2010). In that case, a state trooper saw a vehicle traveling below the speed limit. The trooper noticed that the driver did not glance over at the trooper's patrol car, had his hands "'at ten and two,'" was driving a clean rental vehicle, and appeared tense. [*Id.* at 65.] The driver slowed down even more when the trooper began following him, and

12

eventually exited the interstate without signaling. When questioned, the driver explained that he had been living with his uncle in Reno, Nevada, but was driving back to Pennsylvania to take care of his barn, which had burned down. The Nebraska Court of Appeals determined that the trooper lacked reasonable suspicion to detain the driver for a canine sniff.

In each of these cases, there was a reasonable, innocent explanation for the unusual travel plans. Here, however, there is not. And, as discussed below, this case contains many factors not present in the other cases. The unusual length, nature, expense, and duration of the trip weigh heavily in favor of a finding of reasonable suspicion.

### (b) Laws' Nervousness

Pelster noticed that Laws was exceptionally nervous, so much so that his hands were shaking. But trembling hands and other signs of nervousness may be displayed by innocent travelers who are stopped and confronted by an officer, and thus these observations do little to support a reasonable suspicion of criminal activity. [*State v. Anderson*, 605 N.W.2d 124 (Neb. 2000).] This factor weighs little, if at all, into the reasonable suspicion calculation.

### (c) Laws' Explanation of His Shaking Hands

When asked by Pelster, Laws explained that his hands were shaking because he had not consumed alcohol in some time. This explanation is odd when it is considered in light of the fact that Laws also stated that he had been the only driver during the trip, for it begs the question of why the parties would choose a chemically dependent driver for a lengthy road trip. And Laws later contradicted his statement that he had been the only driver when he told Pelster that he did not know when they had left Michigan because he had been intoxicated in the back seat. A reasonable officer would be suspicious of Laws' explanation.

### (d) Use of Single Driver on Very Long Trip

This factor is somewhat related to the explanation of Laws' shaking hands. But it is also of independent significance that Laws, who was not identified as an authorized driver on the rental agreement for the SUV, claimed that he was the only driver on what was undisputedly a very long road trip, particularly when all parties agreed that they drove straight through.

### (e) Camper Had Not Been Used During Trip

Neither Laws nor Howard challenges the district court's finding that the camper was never used. And this finding is significant; the fact that a camper was pulled for 1,800 miles one way and then never utilized, either en route or upon reaching the destination of a "camping trip," is quite suspicious. This is particularly so when the camper was rented for the sole purpose of the trip. This factor weighs heavily in the reasonable suspicion analysis.

### (f) Recent Law Enforcement Contacts of Laws and Howard

Both Laws and Howard had recent law enforcement contacts which included weapons charges and assaults, and Laws had prior involvement in a homicide. Laws and Howard contend that because the contacts were not drug related, they lack probative value in the reasonable suspicion analysis. Laws cites *State v. Draganescu*[, 755 N.W.2d 57 (Neb. 2008)] for this proposition.

We stated in *Draganescu* that a person's "drug-related criminal history" is a factor to be considered in the reasonable suspicion analysis. [*Id.* at 75.] But the prior criminal history in that case was drug related, and our choice of words was based on the factual circumstances of the case. *Draganescu* cited *State v. Lee*, [658 N.W.2d 669 (2003),] and in that case, we recognized that any prior criminal history may be a relevant factor in the reasonable suspicion analysis. This factor weighs at least slightly in favor of a finding of reasonable suspicion.

### (g) Conclusion

14

Although some of the factors identified by the district court, when examined in isolation, do not weigh heavily in favor of a finding of reasonable suspicion that the occupants of the vehicle were engaged in criminal activity, when viewed in their totality, the circumstances indicate that Pelster had reasonable suspicion to detain the occupants for the canine unit after the completion of the traffic stop. The illogical nature of the trip is a prime factor in this analysis, and when combined with Laws' odd explanation for his shaking hands, the fact that the camper was never used, and the criminal backgrounds of both Laws and Howard, Pelster had a reasonable suspicion that the vehicle's occupants were engaged in criminal activity. We affirm the district court's finding that there was reasonable suspicion to detain the vehicle for the canine unit.

*Howard*, 803 N.W.2d at 459-463 (footnotes omitted).

The Nebraska Supreme Court's findings of fact and conclusions of law on this issue are entitled to deference under the statutory standard of review that applies to factual and legal conclusions reached by the state courts. The Nebraska Supreme Court determined that Pelster had a reasonable, articulable suspicion that Howard was involved in criminal activity. Upon careful consideration, the court finds that it cannot be said that this "ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 131 S.Ct. at 786-787.

Even if the court were to make an independent determination of this claim's merits, it would determine that Howard is not entitled to relief. Under the relevant United States Supreme Court precedents, the court would consider the totality of the circumstances in determining whether Pelster had reasonable suspicion. *See United States v. Arvizu*, 534 U.S. 266, 273 (2002) ("When discussing how reviewing courts should make reasonable-suspicion determinations, we have said repeatedly that they must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing.")

15

That is, this court's analysis would mirror that conducted by the Nebraska Supreme Court.  Like the Nebraska Supreme Court, this court would determine that based on the totality of the circumstances, Pelster had a reasonable suspicion that Howard was engaged in criminal activity.  Howard is not entitled to a writ of habeas corpus on this claim.

## B.     Length of Detention Not Unreasonable

Liberally construed, Howard claims that he was subjected to an unreasonable seizure in violation of the Fourth Amendment because the length of his detention was unreasonable.  Specifically, Howard alleges that he waited one hour for the canine unit to arrive.  (Filing No. 1 at CM/ECF p. 7.)  Thomas raised a similar claim to the Nebraska Supreme Court on direct appeal.  (*See* appellate brief at Filing No. 10-8 at CM/ECF p. 2.)  The Nebraska Supreme Court adjudicated and rejected the argument on the merits.  *See Howard*, 803 N.W.2d at 463-464.  In denying the claim, the Nebraska Supreme Court wrote, in relevant part:

> Howard argues that the length of the continued detention was unreasonable. If reasonable suspicion exists for a continued detention, the court must consider whether the detention was reasonable in the context of an investigative stop, considering both the length of the continued detention and the investigative methods employed. [*State v. Louthan*, 744 N.W.2d 454 (Neb. 2008).] An investigative stop must be temporary and last no longer than is necessary to effectuate the purpose of the stop. [*State v. Lee*, 658 N.W.2d 669 (Neb. 2003).] Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time. [*Id.*]

> The method utilized by Pelster, a canine sniff, is generally considered to be minimally intrusive. [*Id.*] And there is no rigid time limitation on investigative stops. [*United States v. Sharpe*, 470 U.S. 675 (1985).] Here, the focus is on the diligence of Pelster, the officer

pursuing the investigation, and the question is how quickly he requested the canine unit and how quickly the unit was dispatched.

The district court found that Pelster issued the citation and returned Laws' license to him at 1:26 p.m. Immediately after that, Laws gave consent to search his luggage, and then at 1:34 p.m., Howard refused consent to search the vehicles. Pelster then requested the canine unit, and the nearest available unit was en route from Omaha by 1:50 p.m. The unit arrived at 2:30 p.m., and the canine sniff was completed by 2:36 p.m. Nothing in the record indicates any lack of diligence or abuse of discretion on the part of Pelster in seeking a trained canine unit. The mere fact that it took nearly an hour for the unit to ultimately arrive does not make the delay unreasonable, nor does the fact that the stop was conducted on the side of a busy interstate highway. We affirm the district court's finding that the detention was reasonable and did not amount to a de facto arrest.

*Howard*, 803 N.W.2d at 463-464 (footnotes omitted).

The Nebraska Supreme Court's findings of fact and conclusions of law are entitled to deference under the statutory standard of review that applies to factual and legal conclusions reached by the state courts. The court considered the length of the continued detention and the investigative methods employed and determined that the detention was reasonable. Indeed, the Supreme Court has stated there is no time limitation on investigative stops, and has emphasized "the need to consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes." *United States v. Sharpe*, 470 U.S. 675, 685-686 (1985). If authorities are pursuing a legitimate course of investigation diligently, the courts "should not indulge in unrealistic second guessing." *Id.* at 686. In light of this precedent, the Nebraska Supreme Court's decision on this matter cannot be said to have been contrary to clearly established Federal law as determined by the Supreme Court of the United States. *See* 28 U.S.C. § 2254(d)(1).

Moreover, even if the court were to make an independent determination of this claim's merits, it would determine that Howard is not entitled to relief. Pelster's testimony at the suppression hearing reflects that he acted diligently to obtain the dog (*see* Filing No. 10-14 at 47-50), and also shows that the traffic stop was not unreasonably prolonged before the dog was employed. *See Illinois v. Caballes*, 543 U.S. 405, 407-08 (2005) (holding a dog sniff may be the product of an unconstitutional seizure if the traffic stop is unreasonably prolonged before the dog is employed); *see also United States v. White*, 42 F.3d 457, 460 (8th Cir. 1994) (determining that it was reasonable for an officer to detain a truck for 80 minutes while awaiting the arrival of a drug dog where the officer "acted diligently to obtain the dog, and the delay was caused only by the remote location of the closest available dog."). Howard is not entitled to relief on this claim.

## C.   No Ineffective Assistance of Trial Counsel for Waiving Jury Trial

Liberally construed, Howard claims that he was denied due process and the effective assistance of counsel in violation of the Sixth and Fourteenth Amendments because trial counsel waived Howard's right to a jury trial. (Filing No. 1 at CM/ECF p. 7.) Thomas raised two related claims to the Nebraska Supreme Court on direct appeal. (*See* appellate brief at Filing No. 10-8 at CM/ECF p. 2.) He argued that the district court erred in conducting a stipulated trial without advising Petitioner of the rights he was waiving, and that his trial counsel was ineffective in proceeding with the stipulated bench trial. (*Id.*) The Nebraska Supreme Court adjudicated and rejected these argument on the merits. *See Howard*, 803 N.W.2d at 467-468. The Nebraska Supreme Court wrote, in relevant part:

Stipulated Bench Trial Not Guilty Plea

Howard argues that by agreeing to go forward with a stipulated bench trial, he essentially entered a de facto guilty plea, and that the district court erred by not informing him of the constitutional rights he was giving up by doing so. The record shows that after Howard waived

his right to a jury trial, a bench trial was held on March 1, 2010. The State referred to the trial as a "stipulated trial." At this trial, the State offered documentary evidence and Howard's counsel made no evidentiary objection to the admission of the evidence. Howard did not present evidence. He did, however, preserve all the issues he had raised in his motion to suppress. After considering the admitted evidence, the court found Howard guilty of the crime charged.

A stipulation entered by a defendant can be tantamount to a guilty plea. But this is true only when the defendant stipulates either to his or her guilt or to the sufficiency of the evidence. Howard did not do so. Instead, he merely stipulated to the admission of certain evidence, and then the district court determined whether that evidence was sufficient to convict him of the crime charged. Simply stipulating to the admission of evidence is not tantamount to a guilty plea. Moreover, it is clear from the record that Howard preserved all of the defenses and arguments he raised in his motion to suppress. Where the defendant has presented or preserved a defense, such as the suppression of evidence, a stipulated bench trial is not tantamount to a guilty plea. [*People v. Horton*, 570 N.E.2d 320 (Ill. 1991).]

We conclude that Howard's participation in the stipulated bench trial was not tantamount to a guilty plea, and the district court did not err in failing to inform him of any constitutional rights he was waiving by participating in the stipulated trial.

No Ineffective Assistance of Counsel

Howard contends that his trial counsel was ineffective for failing to contest his guilt. Under *Strickland v. Washington*, [466 U.S. 668 (1984),] in order to prevail on a claim for ineffective assistance of counsel, a defendant must show that his or her counsel's performance was deficient and that he or she was prejudiced by such deficiency. According to *United States v. Cronic,* [466 U.S. 648 (1984),] under certain limited circumstances, prejudice to the accused is to be assumed (1) where the accused is completely denied counsel at a critical stage of the proceedings, (2) where counsel fails to subject the prosecution's case to meaningful adversarial testing, and (3) where the surrounding

19

circumstances may justify a presumption of ineffectiveness without inquiry into counsel's actual performance at trial.

Howard does not cite to either *Strickland* or *Cronic,* but he argues generally that his counsel did not subject the prosecution's case to meaningful adversarial testing at all, because the stipulated bench trial was a de facto guilty plea. As noted, however, nothing about the stipulated bench trial was tantamount to a guilty plea, and therefore Howard's trial counsel could not have been ineffective under either the *Strickland* or the *Cronic* standard in failing to contest his guilt by proceeding with the stipulated bench trial. Howard makes no argument as to either performance or prejudice outside the assertion that a stipulated bench trial is equivalent to a guilty plea. Howard's ineffective assistance of counsel claim is without merit.

*Howard*, 803 N.W.2d at 467-468 (footnotes omitted).

The Nebraska Supreme Court's findings of fact and conclusions of law are entitled to deference under the statutory standard of review that applies to factual and legal conclusions reached by the state courts. Indeed, the Supreme Court has emphasized that the deference due the state courts applies with vigor to decisions involving ineffective assistance of counsel claims. *Knowles v. Mirzayance*, 129 S. Ct. 1411, 1418-20 (2009) (reversing the Ninth Circuit Court of Appeals and holding that the decision of the California Court of Appeals that the defendant was not deprived of effective assistance of counsel when his attorney recommended withdrawing his insanity defense during second phase of trial, was not contrary to or an unreasonable application of clearly established federal law; also concluding, among other things, that there was no reasonable probability that, but for counsel's alleged unprofessional error, the result of the proceeding would have been different).

In *Knowles*, the Justices stressed that under the *Strickland* standard, the state courts have a great deal of "latitude" and "leeway," which presents a "substantially

higher threshold" for a federal habeas petitioner to overcome.  As stated in *Knowles*:

> The question "is not whether a federal court believes the state court's determination" under the *Strickland* standard "was incorrect but whether that determination was unreasonable–a substantially higher threshold." *Schriro*, *supra*, at 473, 127 S. Ct. 1933.  And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.  See *Yarborough v. Alvarado*, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004) ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations").

*Id.* at 1420.

Here, the Nebraska Supreme Court reviewed all of the evidence and determined, based on *Strickland* and other federal and state law, that Howard's trial counsel's performance was not deficient.  The court agrees.  The court has carefully reviewed the record in this matter and finds that the Nebraska Supreme Court's decision was not "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  Howard has not submitted any evidence, let alone clear and convincing evidence, that the Nebraska Supreme Court was incorrect in any of its factual determinations.  28 U.S.C. § 2254(e)(1).  The grant of a writ of habeas corpus is not warranted on this issue because the Nebraska state courts correctly applied *Strickland* and other federal law.

## D.   Remaining Claims Procedurally Defaulted

Respondent argues, and the court agrees, that Howard's remaining claims are procedurally defaulted.  As set forth above, a state prisoner must "fairly present" the substance of each federal constitutional claim to the state courts *before* seeking federal habeas corpus relief.  *O'Sullivan*, 526 U.S. at 844.

In Howard's Petition, he argues that his trial counsel and his appellate counsel "did not file [a] motion for newly discovered evidence once it was known [that] co[-]defendant Anthony Laws had a proffer interview prior to trial." (Filing No. 1 at CM/ECF p. 8.)  He also argues that his trial counsel and his appellate counsel "did not raise prosecutorial misconduct . . . in a timely manner," and did not "cross examine witnesses." (*Id.* at CM/ECF p. 5.)  In the court's initial review of Plaintiff's Petition, the court liberally construed these arguments to be additional ineffective-assistance-of-counsel claims. (*See* Filing No. 8 at CM/ECF pp. 1-2.)  Howard did not raise any of these claims in the Nebraska state courts, and he would be barred from raising them in a successive state post-conviction action because the claims could have been raised on direct appeal or in his first post-conviction action.  Accordingly, these claims are procedurally defaulted and the court cannot reach their merits.

Howard has not argued, much less demonstrated, cause and prejudice for the default. *See Coleman v. Thompson*, 501 U.S. 722, 750 (1991) (holding that to excuse a procedural default, a petitioner must demonstrate either cause for the default and actual prejudice as a result of the alleged violation of federal law, or, in rare cases, that failure to consider the claim will result in a fundamental miscarriage of justice). Moreover, Howard has not argued that the court's failure to consider these claims will result in a fundamental miscarriage of justice. *See Abdi v. Hatch*, 450 F.3d 334, 338 (8th Cir. 2006).  Howard is not entitled to relief on these claims.

## IV.  CERTIFICATE OF APPEALABILITY

A petitioner cannot appeal an adverse ruling on his petition for writ of habeas corpus under § 2254 unless he is granted a certificate of appealability.  28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1).  A certificate of appealability cannot be granted unless the petitioner "has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  To make such a showing, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's

assessment of the constitutional claims debatable or wrong." *Slack v. Daniel*, 529 U.S. 473, 484 (2000).

In this case, Howard has failed to make a substantial showing of the denial of a constitutional right. The court is not persuaded that the issues raised in the Petition are debatable among reasonable jurists, that a court could resolve the issues differently, or that the issues deserve further proceedings. Accordingly, the court will not issue a certificate of appealability in this case.

IT IS THEREFORE ORDERED that:

1.    This matter is dismissed with prejudice, and a separate judgment will be entered in accordance with this Memorandum and Order.

2.    The court will not issue a certificate of appealability in this matter.

DATED this 3rd day of September, 2013.

BY THE COURT:

*Richard G. Kopf*
Senior United States District Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.